## Case No. 11,275.

### POPE et al. v. The R. B. FORBES.

### [1 Cliff. 331.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1859.[2]

COLLISION — VESSELS CLOSE HAULED AND WITH WIND FREE—STEAM AND SAIL.

1. A vessel that has the wind free, or is sailing before or with the wind, must keep out of the way of a vessel that is close hauled, or sailing by or against the wind.

2. The vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences.

3. Steamers are always under obligation to do whatever a sailing vessel going free or with a fair wind would be required to do under similar

---

[1] [Reported by William Henry Clifford, Esq.]
[2] [Affirming Case No. 11,598.]

circumstances; and their obligation extends still further, because they have a power to avoid collision, not belonging to sailing vessels even with a free wind.

4. As a general rule. when a steamer meets a sailing vessel, whether the latter is close hauled or with the wind free, the sailing vessel has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid a collision.

5. It is the duty of the sailing vessel to keep her course; and if she fails to do it, and a collision ensues, the fault will be attributable to her, and the master of the steamer will be responsible only for a fair exertion of the power of his vessel to avoid the collision, under the unexpected change of course and the other circumstances of the case.

Appeal from the district court in a cause of collision. The libel was entered at a special district court held on the 21st of October, 1856, and thence continued to the 25th of the same month, when, after a full hearing, a preliminary decree was pronounced in favor of libellants and an assessor appointed, whose report was made and filed March 27, 1857, and on the same day a final decree was entered against the steamboat for the sum so reported, and costs. [Case No. 11,598.] The suit was in rem [by William Pope and others against the steamboat R. B. Forbes, Charles Pearson, treasurer, claimant], and the libel alleged that the schooner Eliza, on the 22d of May, 1856, on a voyage from Machias to Boston, in the evening, was beating up towards her port of destination, when the lights of the steamer were first discovered, about one mile distant, and coming from the direction of the city, and being, as nearly as could be judged, abreast the "Castle." At that time she was seen by the master, who was standing at the wheel; by the mate and one of the crew, who were upon the lookout, and in the forward part of the schooner. The steamer had a ship in tow, fastened to her side. When the steamer was first discovered, the schooner was heading about northwest by west, and the wind blowing about north by east. The weather was overcast, and the schooner was sailing close hauled upon the wind, with her starboard tacks aboard, and going about five miles an hour. When the schooner was more than half a mile distant, the master called to the seaman on the lookout to come aft and get a light, and the seaman, taking the light then burning from the binnacle, carried it forward, and standing upon the forward part of the deck load, swung the light backward and forward in plain view of the approaching steamer. As the steamer further approached, the master and some of the crew shouted to the crew of the steamer to keep clear, which they then had time to do. The steamer kept on her course, and ran the vessel she had in tow into, and did serious damage to the schooner, in consequence of which she sank to the water's edge. The libel alleged that the schooner had all sails set except the gaff topsail, and kept steadily on her course from the time the steamer was first seen till the collision. The answer denied that the material facts of the collision were correctly stated in the libel. The R. B. Forbes was hired by the ship Romance of the Seas to tow her from the port of Boston; the steamer was not under the care or direction of her owners, but under that of the owners of the ship, her master, and a branch pilot, to whom at the time the management of both ship and steamer was committed. If the steamer, at the time of the collision, was not sailing in the proper direction, those who had control both of her and the ship should be responsible. Powerful lights were displayed from the ship and steamer, and the steamer's whistle was frequently sounded. The answer. moreover, set up that the schooner, previous to the accident, was going about northwest,—the wind being about north by east,—and was sailing close hauled, and going about five miles an hour; but that just before the accident, she suddenly tacked, and was at the time of the collision heading about north, across the bows of the ship.

C. F. Pike, for libellants.

When a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precaution to avoid a collision, and if this is not done, prima facie the steamer is chargeable with fault. Oregon v. Rocca, 18 How. [59 U. S.] 391; The R. B. Forbes [Case No. 11,598]. When a sailing vessel is lashed to a steamer, and the sailing vessel is moved entirely by the power of the steamer, the latter is liable for the injury caused to another vessel in collision with the sailing vessel so lashed; in case of negligence. Philadelphia & R. R. Co. v. Derby, 14 How. [55 U. S.] 486; Sproul v. Hemmingway, 14 Pick. 1; Fletcher v. Braddick, 2 Bos. & P. [N. R.] 182. The fact (which is denied) that a pilot had command does not relieve the steamer from liability. Rodrigues v. Melhuish, 28 Eng. Law & Eq. 474; Fletcher v. Braddick. 2 Bos. & P. [N. R.] 182; The Neptune, 1 Dod. 467.

H. F. Durant, for claimant.

The rule that a steamer must, at her peril, keep out of the way of all sailing vessels, does not apply in a dark night, when the sailing vessel is invisible. In such case the only duty of the steamer is to use ordinary care and reasonable precaution to avoid a collision. The Delaware v. The Osprey [Case No. 3,763]. In this case the care was extraordinary, and every precaution that could be employed was used. Four bright lights were forward, and fourteen hands were on the forecastle of the ship as lookouts, and four on the tug. The steam-whistle was constantly sounding, and the steamer and her tow were moving along only three miles an hour, instead of thir-

teen. If either vessel was responsible, it was the ship under the command of a duly licensed pilot. The steamer was not the author or the agent of the injury. The Carolus [Id. 2,424]; The Maria, 1 W. Rob. Adm. 95; The Agricola, 2 W. Rob. Adm. 10. The schooner's carelessness, as a matter of fact, caused the disaster. She had no permanent light, and she changed her course. The showing the binnacle light makes against her, since she was thus left ten or fifteen minutes without a compass to steer by.

CLIFFORD, Circuit Justice. Some of the circumstances and incidents of the disaster, as well as many of those immediately preceding it, are either admitted or so fully proved, that they cannot be regarded as the subjects of dispute. It is certain that a collision took place between the schooner and the ship, and there is no reason to doubt that it occurred at the time and near the place set forth in the libel, probably about midway between the Long Island light and the place where it is alleged that the steamer was when her lights were first discovered by the master, mate, and crew of the schooner. Damage was done to the schooner by the collision, and to such an extent that, within an hour after, she sank to the water's level. She was a topsail schooner of about one hundred and twenty tons, with a full, square, bluff bow, and was heavily laden with lumber. Unlike the schooner, the ship was sharp built, being, according to the testimony of the master, two hundred and forty-one feet long on her deck, and about sixty from the knight heads to the end of the flying jibboom, and measuring more than seventeen hundred tons. Her sails were furled, and the steamer was lashed to her starboard side, and fastened, forward and aft, to the bits of the ship by a line, so that the bows of the steamer reached only to the forerigging of the ship, and they were both moved by the steamer, which was the only motive-power. When the lights of the steamer were first discovered by the master and crew of the schooner, it is clearly proved that the steamer was about a mile distant, and nearly opposite "the Castle," and it is equally well established that the schooner was then sailing close hauled upon the wind, with her starboard tacks aboard, heading probably about northwest by west, and going about five miles an hour. It is alleged in the libel, and admitted in the answer, that the wind was about north by east, and the weight of the evidence clearly shows that the schooner would lay within five or six points of the wind; and Thomas Milans, a seaman on board the schooner, testified that she was then sailing on the wind, about west-northwest, as near as she would lay. Enoch Wasgett testified that a square-rigged vessel will lay within about six points, and that this schooner would

lay about as near as a square-rigged vessel. Mathew Hunt testified that a common coasting schooner will stand within five or five and a half points, and many of them will lay within five points. Henry Rose, Jr., was of the opinion that "a blunt, full, flat vessel" would have to haul nearer to the wind, to make her course, than one of a sharp model. Thomas Rogers said, that some vessels would lay within five points of the wind, and some will not lay so near. The mate of the schooner testified that, at the time of the accident, the schooner was close hauled on the wind, as near as she would lay, within about five points, and that she could lay within five points. Both parties agree in the pleadings that the schooner was close hauled, and, as before remarked, that the wind was north by east; and the evidence clearly shows that it was not more eastward. Assuming that the wind was north by east, or north, and that the schooner was sailing up the harbor, close hauled, on the wind, her course must have been, according to the evidence, either northwest by west, or northwest; and whether it was the one or the other, cannot materially affect the merits of the case. In respect to the steamer, it appears, from the testimony of the master, that she was sailing down the harbor, on a course of east by south, or east half south, against the tide, and at the rate of three or four miles an hour, though the pilot, who was standing on the ship, says that some three minutes before the collision, he altered the course a little more to the eastward. How much alteration was made in the course at that time the witness does not state; but it must have been very inconsiderable, as the master of the steamer makes no mention of it at all, and, what is more, the mate, who was at the wheel all the time, testified without any qualification whatever, that they were steering about east by south, and such it is believed was the course of the ship and steamer at the time the collision occurred; and so it is alleged in the answer; and there is nothing in the testimony of any other witness in the case that conflicts in the least with this conclusion, or that furnishes any countenance whatever to the supposition that any material change was made until the moment the collision took place.

Both sides refer to the condition of the schooner after the collision, and rely upon the particulars of the damage done to her, to support their respective theories as to the manner in which the ship and schooner came in contact; and here there is one important circumstance, which, according to the evidence in the case, is placed beyond the reach of doubt, and that is, that the ship first struck the bowsprit of the schooner on the larboard side. That fact is so fully proved, that no theory inconsistent with it can be sustained (unless it can be reconciled, in some way, with that hypothesis), as the

fact is affirmed by several witnesses, and the marks still visible on that side of the bowsprit, tend strongly to verify their statements into absolute certainty.

Another circumstance in the same connection is satisfactorily established. Immediately after the collision, and almost at the same instant, the stern of the schooner swung round to the westward, which brought her alongside of the steamer. Douglas Fugan, one of the lookouts on the ship, says, "She slewed mighty quick," and her stern came round towards the steamer; that when he first saw her, he thought he saw her bows; and the next he saw, after the collision, was her stern slewing round. The mate of the steamer says, "that her stern, after the collision, swung to the westward with the tide, and she came alongside, and the steamer hit her a thump, and broke off a piece of her stanchion, behind the forerigging." When the vessels came together, the larboard side of the bowsprit of the schooner was first struck, and at a point about two feet behind the cap, and the appearance of the indentation, occasioned by the collision, tends strongly to confirm the testimony of the witnesses for the libellants, that the course of the ship must have been at a very acute angle with the line of the bowsprit, as the indentation is deeper on the side next the cap than on the opposite side toward the stern, and it also affords support to the opinion, expressed by several witnesses, that it was a "glancing blow." Many of the particulars of the damage done to the schooner are also clearly shown, and in respect to some of them there does not appear to be any dispute. It is not questioned that the bowsprit was broken off and carried away, but the parties disagree as to the precise manner in which it was done. On the part of the respondents, it is insisted that the ship and schooner came together at nearly right angles, and that it was broken and carried away by the immediate collision. According to the theory of the libellants, the vessels came together nearly head on, and the ship grazed along on the larboard side of the bowsprit, six or eight feet, towards the stern of the schooner, before it was broken off, leaving marks of black paint from the ship or rigging on the side of the bowsprit, and bending down the gasket staples and inclining them over towards the starboard bow of the schooner. Paint marks, such as might be expected from the cause assigned, are still to be seen on the bowsprit, and the gasket staples on its larboard side are bent down and inclined over in the manner described; and if it be assumed that these indicia are the result of the collision, it must be admitted that they tend strongly to establish the libellant's view of the case.

On the merits, the respondents contend, in the first place, that the schooner was in fault, because they say that she changed her course more to the northward or luffed up into the wind before the collision, and at a time when, if she had kept her course, the collision would not have occurred, and that the effect of the change in her course was to bring her across the bows of the ship, so that the vessels came together nearly at right angles; and if the facts are so, the legal consequences deduced from them by the respondents would clearly follow, as will plainly appear from the nautical rules recognized and approved by the supreme court. Those rules, so far as they are applicable to the different aspects of this case, are in substance as follows: A vessel that has the wind free, or sailing before or with the wind, must keep out of the way of the vessel that is close-hauled, or sailing by or against it; and the vessel on the starboard tack has a right to keep her course, and the one on the larboard tack must give way, or be answerable for the consequences. And the same rule applies to cases where one of the vessels is propelled by steam, with, at least, this difference, that steam vessels are regarded in the light of sailing vessels navigating with a fair wind, and are always under obligation to do whatever a sailing vessel, going free or with a fair wind, would be required to do under similar circumstances; and their obligation extends still further, because they possess a power to avoid collision not belonging to sailing vessels, even with a free wind,—the master having the steamer under his command, both by altering the helm and stopping the engines. As a general rule, therefore, when a steamer meets a sailing vessel, whether the latter is close-hauled or with a free wind, the sailing vessel has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her; and in general it is the duty of the sailing vessel to keep her course, that the steamer may know what measures to adopt in order to avoid the danger; and if the former fails to do this, the fault will be attributable to her, and the master of the steamer will be responsible only for a fair exertion of the power of his vessel to avoid the collision, under the unexpected change of the course and the other circumstances of the case. St. John v. Paine, 10 How. [51 U. S.] 557. Apply the principles to the proposition maintained in behalf of the respondents, and it is clear, if the state of facts assumed as its basis is correct, then the libellants are not entitled to prevail in the suit. Facts, however, to justify or excuse the steamer cannot be presumed without proof. On the contrary, in the absence of proof showing fault on the part of the sailing vessel, the presumption, prima facie, is that the steamer is answerable; and so it has been ruled by the supreme court. The Oregon v. Rocca, 18 How. [59 U. S.] 570. These views lead necessarily to the inquiry, whether the schooner did or did not change her course, or luff up into the wind, as is

supposed by the respondents. Four witnesses, who were on board the schooner, testify in the most positive terms, that she did not. They say she kept her course, and made no change in it whatever, after the steamer was discovered. One of them is the master, who was at the wheel all the time after the steamer hove in view. He says, "She did not change her course"; and asserts, without any qualification, that it was the same course she had been on before the steamer was seen. Another is the mate, who was all the time forward, on the starboard side of the deck-load, except for one or two minutes, when he went on to the knight-heads. He says there was no change whatever, and does not think there was any attempt to make a change, and assigns as a reason for the opinion that, if there had been, they would have sung out to him forward to ease the jib-sheets; and when asked if he knew of his own knowledge that there was no attempt to luff or tack, he answered positively that he knew there was not. Two of the crew also testify, with equal positiveness, that the schooner did not change her course, and one of them says, there was no change made in her sails, to the time of the collision, and, by the bearings of the steamer, she too kept her true course. Those four persons composed the whole of the schooner's company, except the cook, who was below, and had no means of knowledge upon the subject.

Numerous witnesses were introduced by the respondents, and some fourteen or fifteen were examined upon matters bearing directly or indirectly upon the point now under consideration. One observation, however, is applicable to them all, and that is, they had not the same means of knowledge as the witnesses called by the libellants, for the plain reason that they did not see the schooner in season or under circumstances to enable them to ascertain her actual course so well as those on board her, who laid the course and determined her movements; and in respect to several of the witnesses, it is to be observed that their impressions upon the subject are entitled to but little weight when opposed to the positive testimony upon the other side. Thomas Cook, one of the lookouts, when asked what first called his attention to the schooner, answered that it was the schooner herself; and he says he was looking out for vessels ahead, and this one loomed right up under the bows of the ship, whose lights shone down on her deck, and that half a dozen of the men saw her, all at once, and sang right out. He was standing on the starboard side of the top-gallant forecastle of the ship, not far from the cathead. John S. Hilton, another of the lookouts, says that Charles Smith discovered the sail first, and he sung out, "Sail ahead"; the pilot asked where, and he answered, on the starboard bow; the steamboat was then stopped and the wheels reversed. The master of the ship, who was standing, in company with the pilot, the master of the steamer, and his brother, on the ship's house, being asked how far the ship was from the schooner when he first saw her, answered, "that he did not see her until the ship was close aboard of her; she had not struck when he saw her." The master of the steamer, who was standing on the port side of the ship's house, says she was very near the ship when he saw her; that a man on the forecastle sang out, there was a vessel on the starboard bow, and that he went to midships, and then he saw her coming, heading round across the bows of the ship, and he thinks she was about a length off when he saw her, and says she was coming round in a circle, with her topsail flat aback, and was illuminated by the lights on the bows of the ship, and the men forward immediately sang out, "She is coming right into us"; then he heard the pilot say to the man at the wheel, "Starboard the helm," and a few seconds after that they came together. The pilot, who was also standing on the ship's house near the mizzen-mast, when asked how far the steamer was off at the time he first saw her, answered, that he should think the distance was at that time about the length of the ship; but said he could not judge accurately. Charles Smith, the lookout who first discovered the schooner, says when he first saw her she appeared to be coming right head on, and then he could only see her topsail; and he says, when he sang out "Vessel on the lee bow," she appeared to come right up across the bows of the ship, and then he could see her other sails; and he further says, there was plenty of room, as she was going when he first saw her, to pass by the ship, but she changed right up into the wind. He was lying down, and he says he lay so that he might not see the starboard light of the ship. The mate of the steamer, who was in the pilot-house, testified that when he first saw the schooner she was going across the bows of the ship a little distance off; and, on cross-examination, when asked whether the schooner did not appear very suddenly to his sight, he said that she did; that when she shot up into the wind, she appeared all at once, and that was the first he saw of her. Many other witnesses were introduced by the respondents, who state in substance and effect, that they first saw the schooner across the bows of the ship, and several profess to think that she was going in stays, and in fact express the opinion that she must have changed her course.

All the evidence must be considered together, in order to determine which is the true theory as to the manner in which the ship and steamer came in contact; and in this connection, the fact that the ship struck the starboard side of the bowsprit of the schooner cannot be overlooked, as that fact is established by the concurrent testimony of nearly all the witnesses on both sides; and there

does not appear to be any doubt that the marks pointed out and still to be seen on that side of the bowsprit were made at that time; and if so, it would seem that they must have been made by the ship or rigging grazing along on that side several feet before the bowsprit was broken off, and the same remark applies to the peculiar slope of the gasket staples, and this view is also fortified by the appearance of the stern of the schooner, which it is proved was perfectly sound six or eight hours before; and it receives additional confirmation in the fact, which must be admitted, that it was the ship and not the steamer which struck against the starboard bow of the schooner, as it was her larboard side that came in contact with the steamer, when her stern swung round to the westward.

These circumstantial facts all point in the same direction, and indicate very strongly that the witnesses for the libellants are correct when they say that the ship and schooner came together nearly head on.

Assuming this to be the real character of the disaster, then the testimony of all the witnesses on both sides may be reconciled consistently with their integrity; and it is the only basis by which it can be done, as the testimony of those called for the libellants is positive and relates either to their own acts or those within their actual knowledge, and consequently their statements must be true or else the witnesses are false; whereas those called by the respondents, not having seen the schooner until the two vessels were in such close proximity that the danger was imminent, and perhaps a collision inevitable, and then only imperfectly and but for a moment, they may have mistaken, in the surprise and confusion of the occurrence, what was occasioned by the motion and impetus of the ship, or the pressure of her jibboom upon the spars or rigging of the schooner, for a change of course on the part of the schooner, really supposing, on account of the great length of the ship, that the distance between the two vessels was much greater than it actually was; and the testimony of the master of the steamer, when he says that the schooner appeared to be coming round in a circle, and that of another witness, who says she came round "mighty quick," favors this view of the case. Such must have been the opinion of the district judge, when he said: "The sudden and near approach of the schooner, as testified to by the witnesses for the defence, still further confirms the belief that she was not seen until the projecting jib-boom of the ship had begun to press her round, and give her the appearance of going in stays under the ship's bow"; and that view of the evidence introduced on the part of the respondents is believed to be just and reasonable. It is also insisted that the schooner was in fault because she did not seasonably show a light, and that the one ultimately shown, as matter of fact, was not

taken from the binnacle until a collision was inevitable, and when exhibited was feeble and insufficient. Such is understood to be the substance of the defence under this head, as it was presented at the argument. It involves two questions of fact and a question of law of considerable practical importance. Whether the maritime usage of this country absolutely requires merchant vessels to carry a light in the night-time has not been distinctly ruled by the supreme court. That question came up incidentally in the Third circuit, in the case of The Delaware v. The Osprey [Case No. 3,763], and it was there held to the effect that, where a collision occurs between two vessels in the night-time, one having suitable lights and the other having none, it is no more than reasonable, in the absence of any special circumstances affecting the merits of the case, to treat the vessel without lights as the wrongdoer, and liable to make reparation, while at the same time it was admitted that there is no imperative rule upon the subject requiring vessels to carry lights under those circumstances, and that courts of justice have no authority to prescribe a rule and make it binding upon such vessels.

A case not very dissimilar in principle was afterward presented to the supreme court, where the same doctrine is substantially laid down in respect to the removal of a light after it had been shown. According to the statement of facts in that case, the night was dark and rainy, and the wind was blowing fresh. A proper light had been hung in the fore-rigging early in the evening, and kept there till near the time of the collision, which happened about half past eleven o'clock. One of the hands had taken the lamp down to wipe off the water that had collected upon the glass globe, so that it might shine brighter. While he was standing midships wiping the lamp, he heard the approach of the steamer, and immediately placed it on the top of the cook-house, and the collision soon after occurred. On that state of facts the court said: "The fault lies in removing the lamp for a moment from the fore-rigging to midships. If it was not practicable to wipe it in the fore-rigging, another light should have been placed there on its removal. The time of the removal may be, as happened in this case, the instant when the presence of the light was most needed to give warning to the vessel approaching. All the hands examined who were on board the steamer deny that they saw any light at the time on the schooner. We agree, therefore, with the court below, that the schooner was in fault." Rogers v. The St. Charles, 19 How. [60 U. S.] 108.

In Williams v. Hill, 19 How. [60 U. S.] 241, it was held that neither rain, nor the darkness of the night, nor the absence of a light from a sailing vessel, nor the fact that a steamer is well manned and furnished and conducted with caution, will excuse a steamer for coming in collision with a sailing ves-

sel navigating in a thoroughfare out of the usual track of the steam vessel; and the court say that the ruling principle is, that an obligation rests upon all vessels found in the avenues of commerce to employ active diligence to avoid collisions; and add, in effect, that the question, whether the omission of any precautionary measure can or cannot be excused, must depend upon all the circumstances of the case.

The result of the cases seems to be, that while there is no positive rule of law requiring sailing vessels navigating in the night-time to show a light, yet it is no more than a proper precautionary measure on their part, especially in a dark night, and in harbors or other thoroughfares where they are constantly liable to meet steamers or other sailing vessels; and if a sailing vessel thus navigating in a dark night omits that precaution, and a collision occurs doing damage to the dark vessel, and it appears that the want of a proper light on her part occasioned or contributed to the accident, the vessel which showed a proper light, whether steamer or sailing vessel, is not liable; provided it also appears that she is not otherwise in fault, and used all reasonable exertions to prevent the collision.

It becomes important, therefore, to ascertain more particularly the character of the night, and whether a proper light was seasonably shown by the schooner. The master of the steamer testified that the night was cloudy with stars out; that there was no moon, and that it was a good night to see lights any distance; and when asked whether he knew of anything which could prevent a lookout on the forecastle from observing a schooner with a light up a mile off, he answered that he did not, and added, that there was no trouble that night to see a light one, two, or three miles. The master of the schooner testified that the weather was overcast. a star to be seen here and there; and when asked how far the light on board the schooner could be seen, replied, that it could be seen a mile distant. The master of the ship testified that it was clear, with clouds at intervals, and rather hazy on the water. The mate of the schooner testified that it was a night when a light could be seen a great way, and that there were some stars out; and expressed the opinion that it could be seen a mile and a half or two miles as clear as it was that night.

Several other witnesses were examined to the same point, and discrepancies are observable in their testimony; but having come to the conclusion that those already referred to have given the true character of the night as nearly as it can be described, it is unnecessary to recapitulate the other evidence. Not a doubt is entertained that both the ship and steamer had experienced lookouts. John S. Hilton testified that he was on the top-gallant forecastle of the ship on the lookout, and that there were fourteen or fifteen others, all looking out; and the master of the steamer says that twelve or fourteen men were put there and told to look out; and he further says that the pilot and himself were keeping a lookout, and that the lights over the bows of the ship were not visible on the cabin or poop deck where they stood. The schooner also had good lookouts, who saw the lights of the ship and steamer when a mile distant; and the master of the schooner testified that when the steamer was about a half-mile distant. he took the light out of the binnacle, and had it carried forward by one of the crew, and ordered him to swing it backward and forward, so that the steamer, and of course those on board the ship, might know that the schooner was under weigh and was not at anchor, and it appears, according to his testimony, that the seaman immediately took the light, ran forward, and standing on the forward part of the deck-load, on the starboard side, nearly abreast of the foremast, held the light up as high as he could reach, and moved it backward and forward for several minutes; the seaman who held the light, the mate, and another of the crew shouting for them to keep off; and when the ship approached so near that she appeared to be coming right on to the schooner, the master says he ordered the seaman to take the light to the leeward, in order that the steamer might see it instead of the ship, as she had the moving power, and the order was obeyed. This statement of the master. in every essential particular, is fully confirmed by the mate and the two seamen, who were on the forward part of the schooner; and the mate says as soon as those on board the ship and steamer could hear him, he went forward on to the knight-heads, and, when they were about a quarter of a mile distant, commenced to shout to them to keep off, and he. the master, and seaman each called to them three or four times, and continued shouting till the vessels struck. In respect to the character of the light shown by the schooner, the proof is equally full and plenary, that it was a bright light, and such as might be seen on that night at the distance of a mile.

It is no satisfactory answer to the evidence introduced on this point by the libellants, to say that the witnesses called by the respondents have testified that they did not see the light on the schooner till the moment of collision. Such testimony, under the circumstances of this case, only affects the credibility of the witnesses called by the libellants, and cannot avail, for the reasons already given. as well as for others which will presently be stated. Lookouts in sufficient number were placed in the forward part of the ship, where they ought to be, for the reason. among others, which might be given. that the forward view of persons situated near the wheel is liable to

be obstructed by the spars and rigging of the vessel. And the same reason requires that those forward should be so located that they can see ahead and on the respective sides of the vessel to which they are assigned, without any obstruction whatever, either from the lights or any other natural objects connected with the vessel. According to the testimony of the respondents, the ship had two lights, consisting of two large lanterns, one for each bow, and they were hung to the jib-guys, just forward of the sprit-sail yard, and the weight of the evidence clearly shows that, where the lookouts were standing, the lights were directly on the line of view ahead. Some of them say they found it necessary to get down on their knees; and one says he had to lie down to avoid that difficulty. Three lookouts were also stationed on the steamer, two forward and one in the wheel-house, who were men accustomed to that duty, and doubtless performed it as well as they could, in the situation in which they were placed, —the bows of the ship being sixty or eighty feet ahead of the bows of the steamer, and their vision, at least in one direction, seriously obstructed by the light on the starboard guy of the ship to which the steamer was lashed. Blind lookouts cannot fulfil the requirements of law, nor can those who are stationed behind obstructions so that they cannot see, as was substantially the fact with those on board the ship and steamer just before the collision occurred. Lookouts are required for a valuable purpose, and when they are so situated that they cannot accomplish the duty they are expected and required to perform, the case stands as it would if none had been employed; and if there be none such, additional to the helmsman, or if they are not stationed in a proper place or not actually and vigilantly employed in their duty, the supreme court has determined in a case where the omission was on the part of the steamer that it must be regarded as prima facie evidence that the collision was the fault of the steamboat, and that principle is applicable to the present case. The Genesee Chief, 12 How. [53 U. S.] 463; The Catherine, 17 How. [58 U. S.] 177.

It is therefore the opinion of the court that a proper light was seasonably shown by the schooner, and that it was not her fault, or the fault of her master or crew; that it was not seen in time to prevent the collision; and consequently it is not a case where both parties are in fault; and it is equally clear, from all the evidence in the case, that the collision was not the result of inevitable accident.

Steamers are required to exercise the necessary precautions to avoid a collision; and that rule when applied to the facts of this case, as they are found to be, necessarily leads to the conclusion that the libellants are entitled to prevail in the suit, unless the proposition assumed by the respondents, that the ship alone is responsible, can be sustained.

They contend that the ship was wholly under the control of her own master and pilot at the time of the collision, and that the steamer did not, either as principal or agent, cause the damage done to the schooner, and could not have prevented it, and therefore is not liable in this suit; and they also contend that the ship is not liable, because she was under the sole charge and direction of a pilot, duly licensed to act in that capacity by the authorities of the state. Whether or not the ship is liable it is not necessary to consider, as she is not made a party to the suit, and the proposition, so far as it respects the steamer, presents an inquiry of fact, which must depend upon the evidence. It has already appeared that the steamer and ship were made fast together, and that the steamer had the only motive-power. Independently of the steamer, the ship with all her sails furled would have been unmanageable, and incapable of being governed or directed. Her lights were placed by the order of the pilot and the master of the steamer; and the mate of the steamer says that he was in the pilot-house of the steamer steering, and paying attention to orders from her master and pilot; and at the time of the collision he says he had ordered the engine to be reversed, and had put the helm to starboard, before the order was given by the pilot; and the master of the steamer says that he was about to give the order to stop and reverse, and went to the starboard side of the ship for that purpose, but found that it had already been done. On this state of facts, the conclusion must follow that the pilot was under a mistake when he expressed the opinion that the steamer was under his orders. It is clearly shown that it was not so at the time the collision occurred. The mere fact that a pilot was on board assisting in the management of the vessel, and occasionally giving orders, cannot defeat a recovery under the circumstances of this case. Rodrigues v. Melhuish, 28 Eng. Law & Eq. 474; Smith v. Condry, 1 How. [42 U. S.] 28; Beane v. The Mayurka [Case No. 1,175]; Fletcher v. Braddick, 2 Bos. & P. [N. R.] 182; The Neptune, 1 Dod. 467.

I am of opinion, therefore, that the schooner did not change her course after the lights of the approaching vessels were first seen by her master and crew; that she did seasonably show a proper light, and that she was not in fault; but that there was fault on the part of those in charge of the other vessels in this, that the lights were so placed on the ship that they obstructed the vision of the lookouts; and also that the steamer, as the sole motive-power, failed to observe the rule of navigation, which requires steamers meeting sailing vessels to exercise the necessary precautions to avoid

a collision, and consequently that she is liable in this case.

The decree, therefore, of the district court is affirmed, with costs.